## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 05 2017, 8:36 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT D.L.

Linda L. Harris
Kentland, Indiana

ATTORNEY FOR APPELLANT D.R.E.

Russell D. Bailey
Demotte, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of D.E. (Minor Child)

and

D.L. (Father) and D.R.E. (Mother),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

December 5, 2017

Court of Appeals Case No. 37A04-1707-JT-1592

Appeal from the Jasper Circuit Court

The Honorable John D. Potter, Judge

Trial Court Cause No. 37C01-1701-JT-3

**Bailey, Judge.**

# Case Summary

[1] D.R.E. ("Mother") and D.L. ("Father") (collectively, "Parents") appeal the trial court judgment terminating their parental rights to their child, D.E., ("Child"). They raise one issue on appeal which we restate as whether the trial court clearly erred when it terminated their parental rights. We affirm.

# Facts and Procedural History

[2] Child was born on April 6, 2016. On April 8, the Jasper County Department of Child Services ("DCS") filed a petition alleging Child was a Child in Need of Services ("CHINS") because both Child and Mother tested positive for methamphetamine at the time of Child's birth. The petition also alleged that Father had a criminal history for methamphetamine manufacturing. The hospital released Child on April 11 and DCS placed him in foster care.

[3] On April 12, the trial court held a detention hearing at which Father failed to appear, and the court entered an order maintaining Child's out-of-home placement. Mother had supervised visitation with Child on April 13, at which time Mother tested positive for methamphetamine and amphetamine. Mother tested positive for THC at her April 19 visitation with Child, and she tested positive for methamphetamine, heroin, amphetamine, and morphine at her April 27 visitation. Due to Mother's continued drug use, on May 9, the trial

court suspended her supervised visitation until such time as she entered an in-patient drug treatment facility.

[4] Following a May 16 hearing at which Father failed to appear, the trial court adjudicated Child to be a CHINS and made the following findings:

> (A) That mother tested positive for methamphetamine at the birth of the child on April 6, 2016.
>
> (B) That the child tested positive on a urine screen for methamphetamine at birth.
>
> (C) That the mother admitted to using methamphetamine throughout her pregnancy.
>
> (D) That the father of the child has [a] criminal history for methamphetamine manufacturing.
>
> (E) That the mother and father have had their rights terminated on another child through Lake County, Indiana.
>
> (F) The child needs care, treatment, or rehabilitation that the child is not receiving and that is unlikely to be provided or accepted without the coercive intervention of the court.

Ex. at 37.

[5] At a June 27 dispositional hearing, which Father again failed to attend, the court ordered Parents to:

> - participate in parent and family functioning assessments;

- participate in psychological evaluations;

- participate in substance abuse assessments and follow through with all recommendations;

- comply with random drug screens;

- complete "MATRIX" program and follow all recommendations;

- participate in in-patient drug rehabilitation;

- participate in establishing paternity;

- maintain a stable single-family dwelling for a period of at least six months;

- attend all scheduled supervised visitations "sober" and prepared to care properly for the child;

- participate in parenting education; and

- work with home-based caseworker.

*Id*. at 14-15. In addition, the court ordered Father to participate in "Father Engagement." *Id*. at 15.

[6] In July of 2016, Mother called DCS and informed them that she had admitted herself into an in-patient drug treatment center in Chicago. However, one week later, Mother informed DCS by telephone that Mother had left the drug

treatment program. On July 15, Father was arrested and incarcerated for operating a vehicle as a habitual traffic offender.

[7] The trial court held a review hearing on September 26, 2016, at which it found that Parents had not complied with Child's case plan. Specifically, the court found that Father had been incarcerated since mid-July 2016 and was therefore unable to participate, and Mother had "gone missing" and had not had contact with DCS since August 2016. *Id*. at 11. The court also found that neither parent had participated in the services ordered, visited Child, or cooperated with DCS.

[8] Father established his paternity of Child on October 14, 2016, while he was still incarcerated. On October 31, Father pled guilty and was released to electronic home detention. The next day, Father contacted DCS to begin participating in services. However, before Father could do so, he was returned to jail in November due to a positive drug test for methamphetamine. During his incarceration, Father completed an in-patient drug treatment program. On March 27, 2017, Father contacted DCS to inform it that he was in the drug treatment program, and he agreed to contact DCS when he was released from jail. Father was released on April 7, 2017, but he never contacted DCS.

[9] Mother did not have any contact with DCS from July 25, 2016 until October 31, 2016, at which time Mother informed DCS that she was "hiding out" because of an active warrant for her arrest on a bond violation. Tr. at 19. Mother would not tell DCS where she was, but she informed DCS that she was

sober and "had her head on straight" and wanted to make things right. *Id.* Mother said she was going to turn herself in "in a few days." *Id.* However, Mother did not have contact with DCS again until January 9, 2017.

[10] At a January 9, 2017 permanency hearing, the trial court changed the permanency plan from reunification to adoption after finding that Parents had still not complied with the case plan. On January 10, DCS filed its petition to terminate Parents' rights as to Child. Mother was arrested at the January 9 hearing for the bond violation, and she was incarcerated until approximately March 28, 2017. At that time, Mother entered into a plea agreement, was placed on probation, and was ordered to attend an in-patient substance abuse program at the YMCA. Mother entered the YMCA program, but tested positive for heroin on April 30, 2017, while she was on a home pass. Mother went back into the YMCA program and was scheduled to complete that program on May 24, 2017.

[11] On May 17, 2017, the court held a fact-finding hearing at which Family Case Manager Erin Smith ("FCM Smith") testified that Parents showed a pattern of substance abuse and instability. She noted that both parents had been jailed twice in just the last year, and both had waited almost a year before starting drug abuse treatment. She noted that Child had been in foster care since birth, did not know either of his parents, and needed a permanent, stable, drug-free home. FCM Smith testified that she believed that termination of Parents' rights was in Child's best interest, and that DCS had a prospective adoptive home available for Child. Although the Court-Appointed Special Advocate

("CASA") did not testify at the hearing, her report also recommended that "parental rights be terminated and adoption pursued." Father's App. Vol. II at 58.

[12] At the May 17 hearing, the trial court made verbal findings and granted the petition to terminate Parents' rights. In its June 8 written findings, the court found that there was a reasonable probability that the conditions that resulted in Child's removal would not be remedied and that continuation of the parent-child relationship posed a threat to the well-being of Child. It found the following facts in support:

> a. Mother's hair follicle test on February 2, 2017[,] was positive for methamphetamine and morphine.
>
> b. Child was a drug[-]exposed infant for methamphetamine and Mother had failed drug tests for one year prior to birth for methamphetamine.
>
> c. Neither parent participated in a substance abuse assessment.
>
> d. [Father] refused to participate in services until paternity was established.
>
> e. Supervised visitation was suspended on May 9, 2016, by the Court because Mother continued to test positive at visits for marijuana, methamphetamine, and heroin[;] [M]other was required to enter inpatient drug treatment for visitation to be reinstated.

f. Mother did not go to inpatient drug treatment arranged for her through DCS referral of 4/12/16 until 3/29/17, which was past the filing of the Petition for Termination of Parent-Child relationship.

g. In July of 2016, Mother enrolled in Haymarket Drug Rehab in Chicago and left within one week.

h. Mother had no contact with DCS from July 26, 2016 to October 31, 2016. Then on October 31, 2016, [M]other called and said she was clean, done hiding out, and going to turn herself in. Mother refused to give her residence and telephone number.

i. Mother then had [no] contact with DCS until January 9, 2017, when Mother appeared at court and was arrested on a warrant. At that time the Permanency Plan was changed to adoption.

j. Mother was missing and therefore drug screens could not be administered to [M]other[;] the ones that she did take she failed multiple times in April of 2016 and one on January 9, 2017.

k. Mother is currently and finally in treatment at YMCA but she failed a test for heroin[ ] on April 30, 2017, while on a home pass from inpatient[,] and [M]other admitted to relapsing at that time.

l. Father was incarcerated when paternity was established in October of 2016[;] prior to paternity being established[, F]ather [had] refused to participate in any services that were offered.

m. When [F]ather was no longer incarcerated[,] the DCS offered [F]ather [F]ather [E]ngagement, case management, [and] drug assessment[,] and then[,] before services could begin[, F]ather was incarcerated for [a] failed methamphetamine drug test on home detention.

n. Father completed inpatient at Recovery Matters while still incarcerated in March 2017, but failed to participate in any follow up care.

o. Father did not contact FCM [Smith] after [his] release in April of 2017.

p. Mother had continuing criminal problems during [the] case[,] including possession of a narcotic drug in July 2016 and [a] Petition to Revoke Probation on May 9, 2017 for drug violation for heroin[ ].

q. Father had continuing criminal problems during [the] case[,] including operating as a Habitual Traffic Violator in July of 2016, [and] failure of a drug test on November 14, 2016, causing a violation in [his] criminal case.

r. Both parents did no services until after Termination of Parental Rights Petition was filed.

s. Mother did not contact DCS due to visitation being suspended[,] stating that if she cannot see the child she was not going to participate in services.

Father's App. Vol. II at 62-64. The trial court also found that termination was in Child's "best interests in that: The child has only known foster care and bonded with foster parents and the child is and will be in a home free of drug abuse and criminal activity." *Id*. at 64. This consolidated appeal by Parents ensued.

# Discussion and Decision

## Standard of Review

[13] Parents maintain that the trial court's order terminating their parental rights was clearly erroneous. We begin our review of this issue by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Family & Children (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty. Office of Family & Children (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[14] Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services.

\* \* \*

(C) [and] that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2) (2016). DCS need establish only one of the requirements of subsection (b)(2)(B) before the trial court may terminate parental rights. *Id*. DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[15] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cty. Office of Family & Children (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Office of Family & Children (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999). *trans. denied*.

[16] Here, in terminating Mother's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[17] Parents do not specifically challenge the trial court's findings of fact.[1] Rather, they contend that the trial court erred in its conclusions of law. Specifically, they allege that the trial court erred in concluding that they will not remedy the conditions that resulted in Child's removal and that the continuation of the parent-child relationship poses a threat to the well-being of Child. Mother also challenges the trial court's finding that termination is in the best interest of Child. Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the

---

[1] Although Father contends that two of the court's findings—that he did not participate in substance abuse assessment and that he completed an in-patient drug program while incarcerated—contradict each other, they do not. Father did not get a substance abuse assessment through DCS and, although he did complete a drug program while incarcerated, there was no evidence before the court as to what kind of assessment, if any, that drug program involved. Moreover, even if the trial court had incorrectly based its decision on contradictory findings, those erroneous findings would not prove fatal as there existed a plethora of valid findings to support the trial court's conclusions, as we discuss below. *Cf. Favor v. Marion Cty. Office of Family & Children* (*In re: A.F.*), 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002) (finding no fatal error in contradictory findings where there were "at least some" valid findings to support the trial court's conclusion), *trans. denied*.

disjunctive, we only address whether the trial court erred in concluding that Parents will not remedy the conditions that resulted in Child's removal and that termination is in Child's best interest.

## Conditions that Resulted in Child's Removal

[18]    Parents maintain that the trial court erred in finding a reasonable probability that the conditions that resulted in Child's removal will not be remedied. In support, they point to evidence of their compliance with some of the court's requirements, such as attending drug treatment. However, their arguments on appeal are simply requests that we reweigh the evidence, which we will not do. *See In re D.D.*, 804 N.E.2d at 265. Instead, we must determine whether the evidence most favorable to the judgment supports the trial court's conclusion. *Id.*; *Quillen*, 671 N.E.2d at 102.

[19]    In determining whether the evidence supports the trial court's finding that Parents were unlikely to remedy the reasons for removal, we engage in a two-step analysis. *E.M. v. Ind. Dep't of Child Servs. (In re E.M.)*, 4 N.E.3d 636, 643 (Ind. 2014). "First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied." *Id.* (quotations and citations omitted). In the second step, the trial court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration evidence of changed conditions. *Id.* However, the court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or

deprivation of the child." *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 226 (Ind. Ct. App. 2008) (quotations and citations omitted). Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* Moreover, DCS is not required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *Id.*

[20] Parents do not dispute that Child was initially removed from their care due to their drug use and/or history of drug possession. Mother tested positive for drugs at the time of Child's birth, at the three subsequent supervised visitations with Child, in February of 2017, and on April 30, 2017—just three weeks before the termination hearing. At the time of Child's birth, Father had a criminal history of manufacturing methamphetamine, and he failed a drug screen in November of 2016—during one of the few, brief periods of time when he was not incarcerated. Moreover, neither parent submitted to regular drug tests, as ordered. Given Parents' habitual and continuing patterns of drug use and their failure to submit to random drug screens, we cannot say that the trial court erred in concluding that the conditions at the time of Child's removal were not, and likely will not be, remedied.

[21] Father contends that, like the father in *Rowlett v. Vanderburgh Cty. Office of Family & Children*, 841 N.E.2d 615 (Ind. Ct. App. 2006), *trans. denied*, he was not given "enough time to demonstrate his desire and ability to parent D.E." Father's Br. at 14. In support, he states that he was given less than two months between the

date he established paternity and the date DCS filed its petition to terminate parental rights. First, Father is incorrect about the timing; almost three months passed between the date he established paternity (i.e., October 14, 2016) and the date the termination petition was filed (January 10, 2017).

[22] Second, and more importantly, unlike the father in *Rowlett*, Father was given numerous opportunities to engage in reunification services both before and after paternity was established. Father chose to wait until approximately six months had passed before he established paternity, and he did not attempt to engage in services before that time even though such services were made available to him. And, unlike the father in *Rowlett*, Father did not engage in extensive services to better himself as a parent while incarcerated; rather, he participated only in the one service required of him—in-patient drug treatment. Moreover, even after establishing paternity and starting drug treatment, Father used methamphetamine immediately after his release from jail on October 31, 2016, resulting in his re-incarceration two weeks later. At no point did Father ever attempt to visit Child, even during the three months before he was incarcerated and the approximate three months after his release from jail. Father had sufficient time to remedy the conditions that led to the Child's removal but he chose not to do so.

## Best Interests

[23] In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *A.S. v.*

*Ind. Dep't of Child Servs.* (*In re A.K.*), 924 N.E.2d 212, 224 (Ind. Ct. App. 2010). "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d at 224. Such evidence, "in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *L.S. v. Ind. Dep't of Child Servs.* (*In re A.D.S.*), 987 N.E.2d 1150, 1158-59 (Ind. Ct. App. 2013), *trans. denied*.

[24] Again, Mother's contentions on this issue amount to requests that we reweigh the evidence, which we will not do. The evidence most favorable to the judgment shows that, despite entering drug treatment, Mother continued to use drugs right up until three weeks prior to the termination hearing. Moreover, she had been "on the run" from law enforcement, was without stable housing, and had been in and out of jail twice during the year since Child was born. Both FCM Smith and the CASA report stated that termination of both parents' parental rights is in Child's best interest. Given that testimony, in addition to evidence that Child needs permanency and stability that Mother cannot provide and that the reasons for Child's removal from Parents will not likely be

remedied, we hold that the totality of the evidence supports the trial court's conclusion that termination is in Child's best interest. The trial court did not err when it terminated Parents' parental rights to Child.

[25]    Affirmed.

Kirsch, J., and Pyle, J., concur.